# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP329-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Ronald J. Moore, Attorney at Law:<br><br>Office of Lawyer Regulation,<br>　　　　　Complainant,<br>　　v.<br>Ronald J. Moore,<br>　　　　　Respondent. |

DISCIPLINARY PROCEEDINGS AGAINST MOORE

| | |
|---|---|
| OPINION FILED: | November 29, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|　COURT: | |
|　COUNTY: | |
|　JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
|　CONCURRED: | |
|　DISSENTED: | |
|　NOT PARTICIPATING: | |

| | |
|---|---|
| ATTORNEYS: | |

**2013 WI 96**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2013AP329-D

STATE OF WISCONSIN          :          IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Ronald J. Moore, Attorney at Law:**

**Office of Lawyer Regulation,**

              **Complainant,**

      **v.**

**Ronald J. Moore,**

              **Respondent.**

**FILED**

**NOV 29, 2013**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1   PER CURIAM.   We review the report and recommendation of the referee, Reserve Judge Robert E. Kinney, that the license of Attorney Ronald J. Moore to practice law in Wisconsin should be suspended for a period of three years and that Attorney Moore should be required to pay the full costs of this disciplinary proceeding, which were $1,254.43 as of June 27, 2013.   The referee's findings of fact, conclusions of law, and recommendation regarding discipline were based on a stipulation

and no contest plea entered by Attorney Moore. No appeal has been filed in this matter. Accordingly, our review proceeds pursuant to SCR 22.17(2).[1]

¶2 After fully reviewing this matter, we agree with the referee that the facts of the complaint, which Attorney Moore has admitted, adequately support the conclusion that Attorney Moore engaged in the six counts of professional misconduct alleged in the complaint filed by the Office of Lawyer Regulation (OLR). We conclude that a three-year suspension of Attorney Moore's license to practice law in this state is the appropriate level of discipline for the misconduct committed by Attorney Moore. Finally, in light of the fact that Attorney Moore did not stipulate to the underlying facts or enter his no contest plea until after a referee had been appointed, we impose the full costs of this proceeding on Attorney Moore.

¶3 The OLR filed the present complaint against Attorney Moore in February 2013. The complaint set forth six counts of professional misconduct arising from Attorney Moore's representation of a husband and wife in a guardianship proceeding and his drug-related actions involving another

---

[1] SCR 22.17(2) states:

> If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter.

client, which ultimately led to Attorney Moore's conviction of two misdemeanor crimes. The complaint asked for a three-year suspension of Attorney Moore's license and an award of costs.

¶4 Attorney Moore filed an answer in which he admitted some of the factual allegations of the complaint, denied other factual allegations, and denied having committed any of the rule violations charged by the OLR.

¶5 After Reserve Judge Kinney was appointed as referee, Attorney Moore entered into a stipulation with the OLR. Pursuant to the stipulation, Attorney Moore withdrew his answer, agreed that the referee could use the allegations of the complaint as a factual basis for a determination of misconduct, and pled no contest to each of the six counts set forth in the OLR's complaint. The stipulation requested the referee to recommend that the court impose a three-year suspension, as initially requested by the OLR. In the stipulation, Attorney Moore represents that he fully understands the allegations of misconduct against him and his right to contest those charges of misconduct, that he understands the ramifications of entering into the stipulation, that he understands his right to consult with counsel and has indeed been represented by counsel in this disciplinary proceeding, and that he is entering into the stipulation knowingly and voluntarily.

¶6 Pursuant to the stipulation, the referee accepted the factual allegations of the complaint as true. Those allegations, which constitute the referee's findings of fact, are summarized in the following paragraphs.

3

¶7 Attorney Moore was admitted to the practice of law in this state in 1984. He most recently was engaged in the private practice of law in Wausau. He has not been the subject of prior professional discipline.

¶8 The first three counts of the complaint relate to Attorney Moore's representation of M.K. and B.K. in a guardianship proceeding regarding their granddaughter, J.A.R. In December 2009 J.A.R.'s mother, who lived in California, sent J.A.R. to live with M.K. and B.K., who resided in Marathon County, Wisconsin. J.A.R. began residing in the home of M.K. and B.K. on December 10, 2009. In February 2010 M.K. and B.K. retained Attorney Moore to pursue a guardianship proceeding with the aim of becoming the legal guardians of J.A.R. Attorney Moore filed a guardianship petition in the Marathon County circuit court on their behalf a few days later.

¶9 The Uniform Child Custody Jurisdiction Act (UCCJA), which has been adopted in Wisconsin, requires that a minor child must reside in the state for a minimum of six months in order for a court of that state to exercise jurisdiction over a guardianship proceeding involving the minor. Because J.A.R. had been living with M.K. and B.K. in Marathon County for only approximately two months at the time the guardianship petition was filed, the Marathon County circuit court lacked jurisdiction to proceed with the guardianship petition.

¶10 By April 2010 Attorney Moore was aware that the child's mother had objected to the guardianship petition, which meant that even if the guardianship case could have proceeded to

4

a resolution, he would have been obligated to prove that J.A.R.'s mother was not fit to care for her.

¶11 By June 2010 J.A.R. had been living continuously with M.K. and B.K. in Marathon County for more than six months. Attorney Moore, however, did not dismiss the pending guardianship proceeding and file a new proceeding in order to comply with the six-month jurisdictional requirement.

¶12 By July 2010 J.A.R.'s mother had retained Attorney Peter C. Rotter to represent her in the guardianship proceeding. Attorney Rotter entered a special appearance in the guardianship case on the mother's behalf, specifically reserving her right to challenge the court's jurisdiction over the petition. Attorney Moore did not give a copy of Attorney Rotter's notice to M.K. and B.K., nor did he explain to them that the petition he had filed was subject to dismissal for failure to comply with the six-month residency requirement.

¶13 The court scheduled a hearing on the guardianship petition for July 29, 2010. Although Attorney Moore met with M.K. and B.K. a few days before the hearing and told them that things were "in good shape" and he was ready for the hearing, he had not obtained any school or medical records for J.A.R., had not obtained any written records at all regarding J.A.R.'s mother, had not issued any interrogatories or subpoenas to the mother, and had not deposed the mother. Indeed, according to Attorney Moore's billing records, he had not done any work on the guardianship matter in either May or June 2010.

5

¶14 On July 27, 2010, Attorney Moore filed a motion for an adjournment of the guardianship hearing due to an illness for which he had been briefly hospitalized. He did not advise M.K. and B.K. that he had any medical issues that might affect his ability to perform his duties as an attorney. The court granted the motion and rescheduled the hearing for October 7, 2010.

¶15 Attorney Moore did not serve interrogatories or document requests on J.A.R.'s mother until August 30, 2010. He did not take her deposition until September 20, 2010. He did not receive her responses to the interrogatories until after he had deposed her. Not until October 4, 2010, just three days prior to the scheduled hearing, did Attorney Moore submit requests to facilities and persons in California for records that might be relevant to the issues for the guardianship hearing. Although he asked for the records to be provided to him in time for the October 7 hearing, he had not received some of the requested records as of October 6, 2010. At no point prior to the scheduled hearing date did Attorney Moore attempt to cure the jurisdictional defect with the guardianship petition that he had filed in February 2010.

¶16 By September 27, 2010, Attorney Moore knew that criminal charges would soon be filed against him. He did not promptly advise M.K. and B.K. of this fact or discuss how this would impact his ability to represent them at the guardianship hearing. On October 4, 2010, a criminal complaint charging Attorney Moore with two misdemeanors was filed in the Marathon County circuit court. State v. Moore, Marathon County Case No.

2010CM1952. The filing of the complaint generated media coverage in the community, which displeased Attorney Moore.

¶17 On October 6, 2010, just one day prior to the guardianship hearing, Attorney Moore finally advised M.K. and B.K. of the criminal charges against him, although he told them that the charges were unfounded. Given the lack of time prior to the guardianship hearing, M.K. and B.K. were unable to make a fully informed decision on whether they should continue to be represented by Attorney Moore or hire a different attorney to replace him.

¶18 Later that same day, Attorney Moore advised M.K. and B.K. that he was too emotionally distraught to be able to represent them at the guardianship hearing the next day. He then filed a motion to adjourn the hearing, claiming that the filing of the criminal complaint and other occurrences had caused him to suffer a temporary mental condition that was impairing his ability to represent his clients. The circuit court granted the motion and rescheduled the hearing for December 6, 2010.

¶19 On October 16, 2010, J.A.R.'s mother appeared at the door of M.K. and B.K.'s home with law enforcement to regain custody of J.A.R. She then took J.A.R. back to California.

¶20 The guardian ad litem (GAL) who had been appointed for J.A.R., Attorney Peter Karoblis, spoke with Attorney Moore and proposed filing a new petition for temporary guardianship. He believed that by doing so he could bring the guardianship matter in front of the circuit court quickly without the need to serve

7

J.A.R.'s mother and could obtain an ex parte order granting temporary guardianship to M.K. and B.K. Attorney Moore doubted that the GAL's proposed course of action would be successful. He discussed it with M.K. and B.K., but did not share his concerns with them. Attorney Moore also did not tell M.K. and B.K. that although the GAL would be filing the new petition, he would be performing legal research and drafting documents to support the petition, for which he would be billing them.

¶21 On November 6, 2010, the circuit court ruled that it lacked jurisdiction over the initial petition filed by Attorney Moore because J.A.R. had not resided with M.K. and B.K. in Wisconsin for at least six consecutive months prior to the filing of the petition. It also ruled that it lacked jurisdiction to hear the temporary guardianship petition filed by the GAL because J.A.R. was no longer physically present in Wisconsin at the time that petition had been filed. On November 11, 2010, M.K. and B.K. directed Attorney Moore to cease doing any further work on their behalf.

¶22 There was also a discrepancy between the retainer agreement that Attorney Moore had presented to M.K. and B.K. for their signatures and the monthly billing statements that he subsequently sent to them. The retainer agreement stated that on execution of the agreement, M.K. and B.K. were to pay $500, which was a non-refundable advanced fee that would be placed into Attorney Moore's business account. It further provided that Attorney Moore would provide monthly itemized billing statements, that the clients were required to pay all costs and

8

fees by the 15th of the following month, and that the clients consented to the placement of all advanced fees into Attorney Moore's business account. The billing statements, however, stated that the clients were required to maintain a $1,000 balance in Attorney Moore's client trust account by the 15th of each month. There was no such requirement in the retainer agreement.

¶23 The referee concluded that these facts were sufficient to prove that Attorney Moore had committed each of the three ethical violations alleged in the OLR's complaint regarding this matter. First, by failing to file a new guardianship petition after J.A.R. had resided in this state for six months in order to cure the jurisdictional defect, and by failing in a timely manner to obtain documents, discovery responses, and deposition testimony needed for the guardianship hearing, Attorney Moore failed to act with reasonable diligence, in violation of SCR 20:1.3.[2] Second, the referee concluded that these facts demonstrated that Attorney Moore had failed to communicate adequately with his clients, in violation of SCR 20:1.4(a) and SCR 20:1.4(b).[3] Third, by failing to communicate in a clear and

---

[2] SCR 20:1.3 states that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[3] SCRs 20:1.4(a) and (b) state as follows: Communication.

(a) A lawyer shall:

(1) Promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in SCR 20:1.0(f), is required by these rules;

9

consistent manner the basis and rate of his fees, what fees were required to be paid in advance, and how advanced fees would be handled, and by stating in the retainer agreement that advanced fees would be nonrefundable, Attorney Moore violated SCR 20:1.5(b).[4]

---

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter;

(4) promptly comply with reasonable requests by the client for information; and

(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[4] SCR 20:1.5(b) states:

(1) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, except when the lawyer will charge a regularly represented client on the same basis or rate as in the past.  If it is reasonably foreseeable that the total cost of representation to the client, including attorney's fees, will be $1000 or less, the communication may be oral or in writing. Any changes in the basis or rate of the fee or expenses shall also be communicated in writing to the client.

(2) If the total cost of representation to the client, including attorney's fees, is more than $1000, the purpose and effect of any retainer or advance fee that is paid to the lawyer shall be communicated in writing.

10

¶24 Counts Four through Six of the complaint involve Attorney Moore's representation of A.E.P., an 18-year-old defendant in a felony criminal case, and the criminal convictions against Attorney Moore that arose out of that representation. Attorney Moore began representing A.E.P. at least by the summer of 2009 and appeared with him at his initial appearance in June 2009. In the early stages of the case, Attorney Moore hoped to negotiate a plea agreement that would allow A.E.P. to avoid a felony conviction. While the case was pending, however, the State filed additional charges against A.E.P. in a series of new cases. Ultimately, there were six cases pending against A.E.P. in the Marathon County circuit court. Consequently, Attorney Moore was not able to negotiate a plea agreement acceptable to both the State and A.E.P.

¶25 A.E.P. was able to post bond and obtain his temporary release from custody in the pending cases. On February 3, 2010, Attorney Moore advised A.E.P. that law enforcement would be raiding his home and that he should therefore bring any drug-related items to Attorney Moore's law office. A.E.P. did as instructed by Attorney Moore. Among the items he brought to Attorney Moore's office were some homemade marijuana pipes. While A.E.P. was at Attorney Moore's office, Attorney Moore asked him what was the usual price at the time for an ounce of marijuana. A.E.P. replied that $400 was the going price.

¶26 The next day Attorney Moore called A.E.P. and instructed him to come back to Attorney Moore's office. When A.E.P. arrived at the office, Attorney Moore gave him $400 in cash and told him to purchase an ounce of marijuana. Attorney Moore also called A.E.P.'s employer and told the employer that A.E.P. would not be coming to work that day because Attorney Moore had something for him to do.

¶27 After A.E.P. left Attorney Moore's office, he contacted an individual for the purpose of buying the marijuana that Attorney Moore wanted. He then stopped at his place of employment and showed his employer the cash. He told his employer that he had to go buy marijuana for his attorney to help him with his case. He left his employer to purchase the marijuana.

¶28 Before A.E.P. could conclude the marijuana purchase, his father telephoned and confronted him about what was happening. The father directed A.E.P. to meet him at a parking lot. When the two reached the meeting place, A.E.P. told his father that Attorney Moore had given him $400 and had instructed him to buy an ounce of marijuana.

¶29 A.E.P.'s parents subsequently went to Attorney Moore's office and confronted him. Attorney Moore denied that he had given any cash to A.E.P. or that he had directed A.E.P. to purchase marijuana for him.

¶30 While this discussion was occurring, A.E.P. arrived at Attorney Moore's office. A.E.P.'s father asked him about the fact that Attorney Moore had denied what A.E.P. had previously

12

reported to his father. At that point, A.E.P. took out the $400 in cash and placed it on Attorney Moore's desk to corroborate what he had told his father. A.E.P. subsequently picked up the cash again and made a comment to the effect that if the money did not belong to Attorney Moore, then it must belong to him.

¶31 At that point, Attorney Moore asked A.E.P. if he could tell A.E.P.'s parents "what was going on." A.E.P. responded affirmatively. Attorney Moore then told the parents that the $400 in cash had been given to A.E.P. so he could make a "good faith buy." Attorney Moore further stated that the assistant district attorney handling A.E.P.'s pending cases and other law enforcement officials knew about the proposed buy. He also told the parents that this was just a good faith buy and that if A.E.P. wanted to work with law enforcement, an actual written contract would need to be drafted. Attorney Moore then took back the $400.

¶32 Several days after this conversation, A.E.P. and his parents terminated Attorney Moore's representation. They then met with successor counsel and described the events that had taken place at Attorney Moore's office on February 4. Successor counsel contacted the assistant district attorney and confirmed that he had not been aware of any proposed good faith buy involving A.E.P. and Attorney Moore.

¶33 A special investigator by the name of Nathan Pauls was prepared to testify that he had spoken with A.E.P. following a January 2010 arrest and had told A.E.P. that he would be willing to speak with A.E.P. once he was out of jail. Special

13

Investigator Pauls, however, also would have testified that he had not had any contact with A.E.P. or Attorney Moore since that initial brief conversation and had not made any arrangements for A.E.P. to cooperate with law enforcement by making drug buys or otherwise.  Special Investigator Pauls further would have testified that his law enforcement unit never attempted to obtain a search warrant for the residence of A.E.P.

¶34  The assistant district attorney would have testified that he had a 30-second telephone conversation with Attorney Moore, who suggested that A.E.P. would be willing to cooperate with law enforcement in exchange for consideration on his pending charges.  The assistant district attorney, however, would also have testified that he immediately dismissed the idea because of the seriousness of the pending charges against A.E.P.[5] In addition, the assistant district attorney never told Attorney Moore that A.E.P. should clear his residence of illegal drugs due to a coming search of the residence by law enforcement.

¶35  As a result of Attorney Moore's interactions with A.E.P., the State charged Attorney Moore with two unclassified misdemeanors:  (1) possession of a controlled substance (THC), as a party to a crime-conspiracy, and (2) possession of drug paraphernalia.  Attorney Moore entered no contest pleas to both charges.

---

[5] Attorney Moore's billing records do not show any entries for a conversation with the assistant district attorney about A.E.P. working with law enforcement to conduct drug buys.

14

¶36 At the time that Attorney Moore asked A.E.P. to purchase marijuana for him, A.E.P. was out on bond in several felony cases. If he had purchased and possessed marijuana, his bond would have been subject to revocation and he could have been charged with additional felony offenses.

¶37 Based on these facts, the referee found that Attorney Moore had committed three violations of the Rules of Professional Conduct for Attorneys. As alleged in Count Four of the complaint, by engaging in conduct that resulted in his conviction of the two misdemeanors identified above, Attorney Moore violated SCR 20:8.4(b).[6] Attorney Moore also violated SCR 20:8.4(c)[7] when he made multiple misrepresentations to A.E.P.'s parents in his office on February 4, 2010. Finally, by attempting to cause A.E.P. to purchase marijuana for him, which could have been detrimental to A.E.P., Attorney Moore represented A.E.P. while having a concurrent conflict of interest, in violation of SCR 20:1.7(a)(2).[8]

---

[6] SCR 20:8.4(b) states it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; . . . ."

[7] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[8] SCR 20:1.7(a)(2) states:

    Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

    . . .

15

¶38 As requested by the OLR and stipulated to by Attorney Moore, the referee recommended that the court suspend Attorney Moore's license to practice law in Wisconsin for a period of three years. The referee also recommended that the court impose the full costs of the disciplinary proceedings on Attorney Moore.

¶39 Our review of a referee's report and recommendation in an attorney disciplinary proceeding follows well-established standards. We affirm the referee's findings of fact unless they are found to be clearly erroneous, but we review the referee's conclusions of law on a de novo basis. In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 71, 740 N.W.2d 125. We determine the appropriate level of discipline to impose given the particular facts of each case, independent of the referee's recommendation, but benefiting from it. In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶40 Given the parties' stipulation that the allegations of the complaint are true, we adopt those allegations as the referee's findings of fact. We agree with the referee that those findings are sufficient to support a legal conclusion that Attorney Moore committed each of the six counts of professional misconduct alleged in the OLR's complaint.

---

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

16

¶41 Turning to the issue of the proper level of discipline, we conclude that a three-year suspension is the appropriate sanction for Attorney Moore's misconduct. Attorney Moore's ethical violations are serious breaches of his obligations as an attorney. Not only did he conspire with another to violate the criminal law of this state, he directed his own client, a young man already facing multiple criminal charges, to break the law again to serve Attorney Moore's own personal cravings. Instead of helping his client to gain a respect for the laws of this state, Attorney Moore demonstrated to his young client his own disdain for the rule of law. Moreover, when confronted by his client's parents, Attorney Moore lied to them, first by essentially claiming that his client was a liar and then by trying to spin a story of an alleged "good faith buy" to cover his own criminal acts. In the other matter, Attorney Moore showed a troubling lack of diligence to address a clear problem that he had caused. His failure to take relatively simple steps to cure the jurisdictional defect his premature filing had caused cost his clients their opportunity to seek a legal role in the upbringing of their granddaughter. A lengthy suspension, with the accompanying requirement that Attorney Moore must prove his character and fitness to resume the practice of law, is an appropriate result of this professional misconduct.

¶42 We further conclude that there is no reason in this matter to deviate from our general policy of imposing the full costs of a disciplinary proceeding on the respondent attorney

17

who is found to have committed professional misconduct. See SCR 22.24(1m). Although Attorney Moore did ultimately enter into a stipulation and no contest plea, he initially filed an answer that denied many of the material factual allegations in the OLR's complaint and denied having committed any of the six charged rule violations. This denial required the appointment of a referee and the accompanying costs of litigating this matter. It is therefore appropriate that Attorney Moore pay the full costs associated with this proceeding.

¶43 Finally, we do not include any restitution obligation in our order. The OLR did not request any restitution award against Attorney Moore as the two representations did not meet the OLR's restitution criteria.

¶44 IT IS ORDERED that the license of Ronald J. Moore to practice law in Wisconsin is suspended for a period of three years, effective December 30, 2013.

¶45 IT IS FURTHER ORDERED that within 60 days of the date of this order, Ronald J. Moore shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶46 IT IS FURTHER ORDERED that Ronald J. Moore shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶47 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.29(4)(c).

18